IN ADMIRALTY

MERIDIAN BULK CARRIERS, LTD.,

       Plaintiff,

v.                     CASE NO.: 8:07-CV-1422-T-33TGW

KINDER MORGAN BULK
TERMINALS, INC.,

       Defendant.

_____/

## ORDER

    This cause is before the Court pursuant to the bench trial of this admiralty and maritime matter brought pursuant to 33 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure in connection with a claim for stevedoring damage to M/V GANG QIANG (the "Vessel").

    Plaintiff, Meridian Bulk Carriers, Ltd. ("Meridian Bulk"), a time charterer of the Vessel, brings its claims against Defendant Kinder Morgan Bulk Terminals, Inc. ("Kinder Morgan") for stevedoring damage to the Vessel based on negligence, breach of contract, and breach of implied warranty of workmanlike performance during Kinder Morgan's performance of stevedoring services.[1]

_____

[1] Meridian Bulk seeks $162,040.61 in damages, which includes the cost of repairs and loss of the use of the Vessel during

1

A non-jury trial was conducted on January 26 and 27, 2009. (Doc. ## 42, 44). Thereafter, the parties filed Proposed Findings of Fact and Conclusions of Law (Doc. ## 55, 56), all of which have been considered by this Court, in addition to the testimony and exhibits presented at trial.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. Background Facts

On March 28, 2005, Meridian Bulk time chartered the Vessel. (Doc. # 49 at 71:9-13). Meridian Bulk then sub-chartered the Vessel to International Trading & Investments (ITI) pursuant to a voyage charter. (Franceschi Dep. Doc. # 20-2 at 22:10-13). Presumably, ITI contracted with Steelport of Florida for the purchase of scrap metal. Steelport of Florida hired Kinder Morgan to load scrap metal on the Vessel. (Doc. # 50 at 4:19-22). Kinder Morgan did not have a contract with Meridian Bulk. (Id. at 5:1-2). Furthermore, Kinder Morgan was not engaged to act on behalf of Meridian Bulk. (Doc. # 49 at 72:24-25, 73:1, 76:9-11).

---

the repairs. Meridian Bulk also seeks prejudgment interest from July 23, 2005 (the date the damage was discovered).

Clause 8 of the Time Charter between Meridian Bulk and the Vessel owners limited the carriage of scrap metal to one voyage and specifically allocated the responsibility of loading to the Charterers (Meridian Bulk) and the Vessel (the "Master" or "Captain"). (Doc. # 49 at 48:1-9). The Time Charter provides: "Charterers [Meridian Bulk] are to load, stow, tally, secure, and trim and discharge the cargo at their expense/time under the supervision responsibility of the Captain." (Ex. 5, clause 8 at 72).

The Time Charter also contained a Scrap Protective Clause which required, at section (B):

> [The] Charterers [Meridian Bulk] undertake that loading of the first layer of scrap not be released until touching the tanktop and not to be dumped/dropped during loading. First layer of scrap to be loaded at height and to be evenly stowed/trimmed to satisfaction of Master before loading balance of cargo.

(Ex. 5, clause 37 at 81).

Furthermore, to ensure that the Vessel was properly loaded, Meridian Bulk hired two surveyors, Captain Betavatzis and Captain Francheschi, to attend the Vessel in Tampa and oversee the loading process. (Doc. # 49 at 50:8-13, 51:1-21, 52:11-15).

**B.   Loading Of the Vessel**

On April 27, 2005, the Vessel was berthed at Tampa, Florida. That same day, Captain Franceschi performed a pre-loading condition survey. (Ex. 2). That survey revealed that the tanktop of Hold No. 3 was lightly corroded and dented, but did not have a hole. (Ex. 2 at 8). From April 27, 2005 through May 4, 2005, Kinder Morgan loaded scrap metal on the Vessel. (Ex. 14).

### 1. Brian Dilts

Mr. Dilts, Kinder Morgan's manager, oversees all stevedoring operations in the port of Tampa. (Doc. # 49 at 112: 22-25, 113:1-13). After voir dire, the Court qualified Mr. Dilts as an expert in the stevedoring industry. (Id. at 113-116). Mr. Dilts testified that Kinder Morgan personnel would have known if a hole was made to the tanktop during loading. Specifically, during bedding down, Kinder Morgan would have a watchman posted at the top of the cargo hold to assist with loading. (Id. at 123:5-25, 124:1-23; Doc. # 50 at 39:16-25, 40:1-25, 41:1-41). Both Kinder Morgan's watchman and crane operator would have heard a loud, unusual noise and would have seen damage if it occurred during loading. (Doc. # 49 at 134:10-25, 135:1-9).

Mr. Dilts testified that Kinder Morgan received and reviewed a copy of the cargo loading plan (the "Stowage Plan")

with the captain or chief officer prior to loading the Vessel. (Doc. # 50 at 5:1-19; Ex. 3). The Stowage Plan set forth Kinder Morgan's obligations to load the Vessel and specifically ordered: (1) that the Vessel remain upright during loading; (2) that loading of the first layer of scrap not be released until touching the tanktop and not be dumped or dropped during loading; and (3) that the duty officer or chief mate be contacted when in any doubt and when necessary. (Ex. 3).

Mr. Dilts, who was present during the loading of the Vessel, testified that Kinder Morgan complied with terms of Stowage Plan. (Doc. # 49 at 116:7-16, 117:4-8; Doc. # 50 at 5:20-25, 6:1-14; Ex. 3). Mr. Dilts also reviewed the activity logs which would record "everything that happens during the loading of the Vessel" including delays, damages, bedding down process and breakdowns. (Ex. 14; Doc. # 50 at 12:10-22). The activity logs confirm that the Hold No. 3 was "bedded down" on April 28, 2005, from 1730 to 1800, and on April 29, 2005, from 0710 to 0900. (Ex. 14; Doc. # 50 at 14:8-14, 15:7-16). The activity logs do not indicate that any damage was caused to the tanktop. (Ex. 14).[2]

---

[2] "Bedding down" is the process wherein the crane operator lowers the crane's grapple to the tanktop and releases the scrap metal so it covers the entire tanktop to form a cushion.

Kinder Morgan had a watchman stationed at the top of the hold overseeing the initial loading process, known as bedding down. (Id. at 123:11-25). The watchman's sole obligation was to communicate with the crane operator to ensure the scrap was properly bedded down and did not damage the hold.

Mr. Dilts testified that after the bedding down process was completed, the captain or crew would approve that the bedding down process was complete before Kinder Morgan would load the remainder of the cargo. (Doc. # 50 at 18:13-22). There were no complaints made by the Vessel's Master or crew about the bedding down process. (Doc. # 50 at 19:8-14). The loading of the Vessel was normal. (Id. at 22: 15-25, 23:1-15). Mr. Dilts testified that if a puncture to the tanktop was made during the loading process, the Vessel's crew and crane operator would have known of the damage because they would have heard it and felt it. (Id. at 26:16-19; Doc. # 49 at 134:22-25, 135:1-9).

Mr. Dilts testified that if the damage occurred in Tampa, such damage would have likely been caused during the preliminary stages of loading that started on April 28, 2005. (Doc. # 50 at 17:6-25). Mr. Dilts also testified that if there was a hole in the tanktop of Hold No. 3 during the

(Doc. # 49 at 122:21-25, 125:13-25, 126:1-25, 127:1-25, 128:1-9).

lengthy journey to Korea, then there would undoubtedly be oil residue on the tanktop near the hole, and there would be a smell of crude oil. (<u>Id.</u> at 18:1-15, 25:1-20). There was no oil residue reported in Korea.

Mr. Dilts reviewed the photographs taken at the discharge port, and he has seen similar damage from grapple tines. (<u>Id.</u> at 9:21-25, 10:1-25, 11:1-13). In Mr. Dilts' expert opinion, the damage to the tanktop of Hold No. 3 was not caused in Tampa, but, rather, was caused by the grapple tines during discharge in Korea. (<u>Id.</u> at 26:20-25; 27:1-12). Punctures from grapple tines are caused during discharge and not during loading. (Doc. # 49 at 132:1-25, 133:1-9).

### 2. Mike Herron

Mr. Herron, the crane operator, was not at trial because he was killed in a motorcycle accident in November 2008. (Doc. # 50 at 16:8-15). Mr. Herron was the only crane operator that loaded Hold No. 3 of the Vessel. (Ex. 14; Doc. # 50 at 15:18-25, 16:1-3). Expert witnesses (Captain Christopher Hanily and Mr. Dilts) interviewed Mr. Herron during their respective investigations of the damage to the Vessel. (Doc. # 50 at 109:21-25).

Mr. Herron told Brian Dilts and Captain Hanily that the damage did not occur during loading. (<u>Id.</u> at 111:1-25). Mr.

Herron stated that he followed the standard practice of bedding down the hold. The activity logs, which Mr. Herron made contemporaneously while loading the Vessel, support that Mr. Herron properly bedded down the hold. (Ex. 14; Doc. # 50 at 110:5-16). Furthermore, Mr. Herron assured Captain Hanily that he had properly bedded down the Vessel prior to loading the balance of the cargo. (Doc. # 50 at 110:1-16). Captain Hanily testified that Mr. Herron stated that he did not hear or notice anything heavy drop out of the crane grapple. (Id. at 111:1-24).

### 3. Captain Christopher Hanily

The Court qualified Captain Hanily as an expert witness in the area of loading scrap metal, marine surveying, and evaluating damages. (Id. at 105:12-21).

Captain Hanily opined that the bedding down process was properly carried out by Kinder Morgan because Mr. Herron used lighter steel to bed down, spent a sufficient amount of time to bed down, and the Master of the Vessel approved the bedding down process. (Id. at 114:18-25, 115:1-4, 117:6-10). In addition, Captain Hanily noted that Meridian Bulk's own surveyor, Captain Betavatzis, who was an eye witness, confirmed that Kinder Morgan properly bedded down the tanktop floor. (Id. at 117:17-25, 188:1-18).

8

Captain Hanily generally opined that damage is more likely to occur during discharge than during loading because the grapple tines are in an open position when dropped on the tanktop floor during discharge and, during discharge, any cargo falling from the grapple tines would fall out over the tanktop. (Id. at 135:1-15).

As to this particular case, Captain Hanily opined that the damage did not happen during loading in Tampa for several reasons. First, if the damage happened in Tampa during loading, someone would have heard loud sounds and, likewise, felt strong vibrations. (Doc. # 50 at 115:19-25, 116:1-5, 117:1-5). Second, if steel falls from the crane's grapple during loading, it typically falls out immediately after the grapple lifts the cargo and, thus, falls onto the pile of cargo and not over the ship's hold and tanktop. (Id. at 115:9-12). Third, during loading when the grapple is lowered, it is in a closed position so no blunt ends are exposed to perforate the deck plate. (Id. at 115:5-18, 124:1-19). Fourth, the only time that the tanktop could have been damaged in Tampa was during the initial phases of loading (because that is the only time that the tanktop is exposed), and if the tanktop was punctured during the initial phases of loading, the crew would have smelled oil or heavy diesel. (Id. at 113:18-25, 114:1-

20). Fifth, if the hole was present in Tampa, oil would have leaked from the Vessel's pitching and rolling during transit to Korea or onto the tanktop and been present during discharge of the cargo. (Id. at 127:3-25, 128: 1-9). Last, there was no oil residue on the tanktop when the Vessel arrived in Korea. (Id. at 127:3-5).

During the loading of the Vessel, the Master never objected to or otherwise disapproved of the manner of loading or bedding down. (Doc. # 50 at 110:14-16, 133:1-5). Captain Hanily also produced a treatise, Thomas on Stowage, which he considered to be the operative text for loading and discharging cargoes. (Doc. # 50 at 131:16-19).

Captain Hanily explained that Thomas on Stowage provides that:

> If the Master disapproves of the method or manner of stowing the cargo, the attention of the foreman is immediately to be brought to . . . If however, the Master acquiesces in the manner in which the stowage is being done, the ship owner cannot at a later date successfully plead that he was not responsible for whatever damage arises from the bad stowage

(Doc. # 50 at 132:8-21).

In the present case, Captain Hanily found that the Master acquiesced and approved the manner of loading. (Id. at 133:1-5). Furthermore Captain Hanily found the Charterers (Meridian Bulk) acquiesced and approved the loading process by and

through their agent on board the Vessel, Captain Betavatzis. (<u>Id.</u> at 133:6-11).

Captain Hanily testified that when discharging a vessel, the grapple is often dropped hard into the cargo to loosen it. (<u>Id.</u> at 121:12-25, 122:1-25, 123:1-10). The grapple tines are in an open position during discharge, and, as discharge nears the end, there is less cargo protecting the tanktop. Thus, the grapple tines can be dropped into an uneven pile of cargo causing one tine to strike the exposed tanktop at an angle and pierce the tanktop. (<u>Id.</u>)

Based on Captain Hanily's review of the photographs of the hole taken at the discharge port, he determined that the hole was caused by a grapple tine upon discharge in Korea. (<u>Id.</u> at 120:1-25, 121:1-25, 122:1-25, 123:1-10).

### 4. Captain Vjeko Franceschi

Meridian Bulk employed two marine surveyors to oversee the loading of the Vessel. (Doc. # 49 at 73:22-24). Captain Franceschi was on board the Vessel in Tampa during the entire loading operation. (Franceschi Dep. Doc. # 20-2 at 91:3-10, 96:8-12). Similar to Captain Hanily, Captain Franceschi testified that, if the tanktop was damaged during loading, the Vessel's crew would have known because the whole ship would have vibrated and rattled. (<u>Id.</u> at 56:6-17, 96:22-25, 97:1-3,

103:17-22, 98:16-25).  Captain Franceschi was on board the Vessel during loading, and he was not notified about any damage. (Id. at 82:21-25, 83:1-4, 113:1-6).

Captain Franceschi personally instructed the Vessel's crew to oversee the loading. (Id. at 102:2-6, 57:8-10). Additionally, Captain Franceschi's pre-loading survey instructed the crew to watch the loading. (Ex. 2 at 13). Captain Franceschi testified that Kinder Morgan had a watchman (signalman) located at the top of the hold during the bedding down process.  (Franceschi Dep. Doc. # 20-2 at 103:5-12).

Captain Franceschi testified that the crew and Kinder Morgan's watchman would have known if damage occurred. (Id. at 103:17-25, 104:1-7).  Captain Franceschi also stated the damage would have been visible. (Id.) Captain Franceschi also testified if there was a hole made during the loading in Tampa, there would be an oil residue on the tanktop. (Id. at 100:9-25, 101:1-6).  There was no oil residue found in this case.

## 5.  Captain Costas Betavatzis

Meridian Bulk's own representative and marine surveyor, Captain Betavatzis, confirmed through correspondence that when he left the Vessel, she was properly loaded and the damage did not occur in Tampa.  (Ex. 21).   Meridian Bulk did not call

12

Captain Betavatzis to testify at trial.

On July 25, 2005 (shortly after damage was reported to Meridian Bulk), Captain Betavatzis wrote the following e-mail:

> I am confident that the damage caused now, during discharging in Korea and <u>NOT on loading</u>. <u>It is impossible to have happened on loading, because shredded cargo was loaded first. Also at the time I left the vsl fm Tampa, the tanktop was fully covered by said cargo</u>, w/o any damage to notice.
>
> During sea passage to Korea, the vsl received full bunkers in Panama. Assuming that this underneath fuel tank was also filled with bunker. The <u>vsl on route to Korea is undoubtedly listed many times which means the amount of fuel should have come out and spoiled (stained) all the tanktop area around</u>. From the photos [M]aster has sent us, I can't see any tanktop area dirty other than small part close to hole. This is a pure explanation that the damage was not a hidden one but surely caused during discharge.

(Ex. 21)(Emphasis added).

As noted by Captain Betavatzis, the damage did not occur in Tampa because the Vessel was properly bedded down. If the hole on the tanktop of Hold No. 3 occurred in Tampa during loading, the cargo and tanktop would have been covered with oil when the Vessel arrived in Korea. There was no report of oil residue on the tanktop. (Ex. 6).

## C.   Voyage from Tampa to Norfolk to Korea

After the Vessel left Tampa, she headed to Norfolk, Virginia, and 18,000 metric tons of scrap metal was loaded on

top of the cargo loaded in Tampa. (Franceschi Dep. Doc. # 20-2 at 105:16-25). The scrap metal in Norfolk was loaded directly on top of the scrap metal already in cargo Hold No. 3. In addition, the stevedores in Norfolk would normally place a bulldozer on top of the scrap metal in the cargo hold to spread it around. (Id. at 106:1-5). Meridian Bulk's own surveyor, Mr. Lee, testified that it was possible that the damage occurred in Norfolk. (Lee Dep. Doc. # 40 at 50:3-24).

On May 17, 2005, the Vessel departed Norfolk and commenced her voyage to Korea, including a passage through the Panama Canal where she took on additional fuel. Each witness testified that the Vessel would have "listed" and rolled at sea en route to Korea and, if a hole were present in the tanktop during the voyage, oil would have spilled out onto the tanktop. (Ex. 21).

The Vessel arrived at Inchon, Korea on June 21, 2005, and laid in inner anchorage waiting for a berth at the port. On July 10, 2005, the Vessel moored alongside a berth in the port and began discharging cargo on July 11, 2005. Hold No. 3 was not discharged until July 23, 2005, nearly three months and 14,000 miles after the Vessel left Tampa.

**D.    Unloading the Vessel in Korea**

Meridian Bulk did not have any surveyors or agents present during the discharge of cargo in Korea. Meridian Bulk did not present any witnesses at trial that were present during discharge of the Vessel in Korea.

On July 24, 2005, Mr. Lee performed a survey and issued a report. Kinder Morgan was not afforded the opportunity to attend the survey and to inspect damages. (Doc. # 49 at 90:24-25, 91:1-15).

Mr. Lee's report listed the damage as: "Tanktop plates at Frame No. 131 were heavily indented/torn/holed. (Dimension: Approx. 200 mm in Length x 80 mm in Width x 25 mm in Thickness)." (Ex. 6). According to Mr. Lee's report, the cause of damage "may be reasonably attributable to the tanktop plating having contacted with heavy steel structures which was considered to be scrap cargo at the initial stage of loading at bottom at the loading port of Tampa, U.S.A." (Id.)

Mr. Lee's report did not cite any reasons for its conclusion that the damage occurred in Tampa. Further, Mr. Lee's report did not include any indication of rust or oil around the hole in the tanktop. Captain Hanily testified as a surveyor, if rust was of particular import in determining the cause of a hole, he would have noted it in the report and taken pictures of the rust. (Doc. # 50 at 163:15-25). Lee's

report attached six photographs: one of the front of the Vessel, two of the hole in the tanktop, and three of the repair process. The photographs do not show oil around the hole or noteworthy areas of rust. (Id. at 125:7-25, 126:1-25).

The Court notes that Mr. Lee was not sworn in by a person authorized to administer oaths either by federal law or by the law in the place of the examination. (Lee Dep. Doc. # 40 at 6: 2-8). Further, it appears that during Mr. Lee's deposition, someone else was in the room with him and, on at least one occasion, the unknown and unauthorized person assisted Mr. Lee in answering a question.

Although he performed the post-discharge survey, Mr. Lee was not present during the discharge of the cargo from the Vessel. (Id. at 15:15-18, 34:20-22). Mr. Lee was certain the Korean stevedores used a grapple to discharge the Vessel. (Id. at 34:23-25). Moreover, Mr. Lee's deposition was taken by telephone on January 22, 2009, three-and-a-half years after he surveyed the Vessel. Mr. Lee testified he did not have a "fresh memory" about the Vessel and had to refer to his report to refresh his memory. (Id. at 36:10-16).

The Court gives little credit to Mr. Lee's testimony due to the lack of information in Mr. Lee's report and the

circumstances under which his deposition occurred. (Doc. # 50 at 95:2-25, 96:1).

### E.  Kinder Morgan is Not Responsible

Kinder Morgan's own witnesses, Ivan Santos, (Doc. # 49 at 74:10-13, 76:9-25, 77:1-13) Captain Franceschi, (Franceschi Dep. Doc. # 20-2 at 82:21-24) and Mr. Lee (Lee Dep. Doc. # 40 at 41:4-14, 48:10-15) each testified that they had no knowledge of whether Kinder Morgan breached the contract or committed negligence.

Each witness that testified stated, if this damage occurred during loading, someone from the ship's crew should have known about it.  Not a single witness testified to seeing, hearing, feeling, seeing or smelling any damage to the Vessel's tanktop during loading.

Captain Franceschi, Captain Hanily and Mr. Dilts each testified that one would have felt the Vessel vibrate if the damage occurred during loading.  Each witness testified that if the damage occurred in Tampa, there would be an oil residue on the tanktop floor when the Vessel reached Korea.  There is no evidence of an oil residue on the tanktop floor.

Further, each witness testified that it was the captain and crew's responsibility to oversee the loading of the cargo,

and if the damage occurred in Tampa during loading, the crew should have detected and reported the damage. In the present case, no witnesses saw, heard, felt or smelled the damage.

The record does not support the claim that Kinder Morgan committed negligence, breached the Stowage Plan, or breached an implied warranty of workmanlike performance. On the contrary, the evidence establishes that Kinder Morgan properly loaded the Vessel.

## II. CONCLUSIONS OF LAW

### A. Breach of Contract

To prevail on a breach of contract claim, Meridian Bulk must show that Kinder Morgan breached the terms of the Stowage Plan. The Stowage Plan obligated Kinder Morgan to: (1) keep the Vessel upright during loading; (2) ensure that the first layer of scrap is not released until touching tanktop and is not dumped or dropped during loading; and (3) contact the duty officer or chief mate in case of doubt and if necessary. Meridian Bulk failed to establish during the trial that Kinder Morgan breached the Stowage Plan. Conversely, Mr. Dilts and Captain Hanily testified that Kinder Morgan complied with each term of the Stowage Plan. (Doc. # 50 at 6:4–14).

Moreover, Meridian Bulk's surveyor, Captain Betavatzis, agreed the Vessel was properly loaded at the time he left the Vessel. Thus, Kinder Morgan did not breach the Stowage Plan.


**B.    Breach of the Warranty of Workmanlike Performance**

Meridian Bulk claims Kinder Morgan breached its warranty of workmanlike performance as set forth in <u>Crumady v. The J.H. Fisser</u>, 358 U.S. 423, 428-29 (1959). Meridian Bulk also asserts that the <u>Ryan</u> Doctrine, a strict liability doctrine, controls this case. However, as will be discussed hereafter, the warranty of workmanlike performance requires a degree of diligence and care akin to negligence, and thus, the <u>Ryan</u> Doctrine does not apply.

**1.    The <u>Ryan</u> Doctrine**

In <u>Vierling v. Celebrity Cruises, Inc.</u>, 339 F.3d 1309 (11th Cir. 2003), the Eleventh Circuit summarized the "Ryan Doctrine" as follows: "a stevedore owes a shipowner a duty of workmanlike performance such that, if the duty is breached, the stevedore must indemnify the shipowner for damages it is required to pay a longshoreman who is injured aboard its vessel." <u>Vierling</u>, 339 F.3d at 1310 (<u>discussing</u> <u>Ryan</u>

<u>Stevedoring Co. v. Pan-Atlantic S.S. Corp.</u>, 350 U.S. 124, 132-35 (1956)).

In essence, <u>Ryan</u> holds a shipowner strictly liable for personal injuries resulting from an unseaworthy vessel. <u>Phillips Petroleum Co. v. Stokes Oil Co., Inc.</u>, 863 F.2d 1250, 1256-57 (6th Cir. 1988). When a stevedore causes the unseaworthy condition through its own negligent or tortious conduct, the stevedore is required to indemnify the shipowner. <u>Cont'l Grain v. P.R. Maritime</u>, 972 F.2d 426, 439 (1st Cir. 1992).

Even in personal injury cases, courts have been extremely reluctant to extend the <u>Ryan</u> doctrine. <u>See</u> <u>Smith & Kelly Co. v. S/S Concordia Tadj</u>, 718 F.2d 1022, 1030 (11th Cir. 1983)("we adopt a rule for cases of the sort presented here that requires damages to be allocated between stevedores and shipowners based on the degree of fault each bears for the injury").

In property damage cases, the <u>Ryan</u> doctrine has been virtually abandoned. <u>See</u> <u>Gator Marine Serv. Towing, Inc. v. McDermott</u>, 651 F.2d 1096, 1100 (5th Cir. 1981)(referring to the doctrine as "withered," and finding disputes between stevedores and vessels over damaged cargo are best accommodated by application of the usual maritime comparative

fault system); Cont'l Grain, 972 F.2d at 439 ("we deem it improvident to apply the warranty liability created by Ryan to property damage claims against stevedoring contractors"). Thus, Ryan does not apply to this case.


### 2. The Warranty of Workmanlike Performance

Outside the context of the Ryan doctrine, the warranty of workmanlike performance parallels a negligence standard. Muller Boat Works v. Unnamed 52' House Barge, 464 F.Supp.2d 127, 145 (E.D.N.Y. 2006); see also Employers Ins. of Wasau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 at n.17 (5th Cir. 1989)("Unlike the implied warranties of the U.C.C., however, these warranties [of workmanlike performance] necessarily parallel a negligence standard rather than imposing strict liability"). "The duty of workmanlike performance arises out of the stevedoring contract, but it does not automatically imply that the stevedore owes the owner indemnity against all liability under all circumstances." Agrico Chem. Co. v. M/V Ben W. Martin, 664 F.2d 85, 92 (5th Cir. 1981).

To prevail on its claim for breach of the implied warranty of workmanlike performance, Meridian Bulk must show

Kinder Morgan failed to use "the degree of diligence, attention, and skill adequate to complete the task," and that it suffered damages as a result. See <u>Little Beaver Enters. v. Humphreys Ry., Inc.</u>, 719 F.2d 75, 77-78 (4th Cir. 1983)(finding, in context of ship repairs, where the defendant "has performed its tasks as a skillful workman should, or where its efforts have been hindered by the actions of the other contracting party, the repair firm will not be held responsible for defects attributable to faulty workmanship").

Meridian Bulk failed to meet its burden on its implied warranty claim. Meridian Bulk had the opportunity to come forward with evidence that Kinder Morgan lacked the degree of diligence, attention, and skill adequate to complete the task of loading the Vessel. However, Meridian Bulk failed to present such evidence to the Court. In fact, the Master of the Vessel and Meridian Bulk's surveyor approved the bedding down process and acquiesced to the loading.

It is undisputed that there was a hole in the Vessel's tanktop after discharge of all cargo. The dispute concerns the timing of the creation of the hole.

In the present case, the mere fact that the Vessel had damage upon discharge does not establish that Kinder Morgan breached its warranty of workmanlike performance. The

evidence presented at trial establishes that Kinder Morgan properly loaded the Vessel. The evidence does not support the conclusion that Kinder Morgan breached a duty of workmanlike performance.

### C. Negligence

It is axiomatic that to prevail on its negligence claim, Meridian Bulk needed to prove each element of duty, breach, causation and damages. Meridian Bulk did not meet its burden.

### 1. The Economic Loss Rule

Meridian Bulk's negligence claim is barred by the economic loss rule. Under federal maritime law, a tort action may not lie where the basis for liability arises from a contract. <u>Motorcity of Jacksonville, Ltd. v. S.E. Bank N.A.</u>, 83 F.3d 1317, 1343 (11th Cir. 1996), <u>vacated on other grounds by Hess v. FDIC</u>, 519 U.S. 1087 (1997); <u>see also</u> <u>E. River S.S. Co. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858 (1986). In <u>Maersk Line Ltd. v. CARE</u>, 2003 AMC 1878 (2003), the vessel owner, Maersk, sued for both breach of contract and negligence. The court noted that the negligence and breach of contract, "causes of action are almost identical." <u>Id.</u> at 1882. In the present case, Meridian Bulk's claim for

negligence is nothing more than a cause of action for breach of the Stowage Plan or its implied warranty. Each claim contains the same allegations of improper loading and seeks the same recovery of damages. Because Meridian Bulk has a remedy in contract, its tort claim is barred by the economic loss rule.

### 2.    Insufficient Evidence of Negligence

Even if Meridian Bulk's negligence claim was not barred by the economic loss rule, such claim would still fail because Meridian Bulk failed to show how Kinder Morgan breached its duty of care or how Kinder Morgan's negligence was the proximate cause of the damage to the tanktop. See e.g., Isbell v. Carnival Corp., 462 F.Supp.2d 1232, 1237 (S.D. Fla. 2006)("Plaintiff fails to provide sufficient evidence to support its negligence action against Defendant because it fails to show how Defendant breached its duty of care to Plaintiff"). Meridian Bulk's negligence claim fails for the same reasons its breach of the warranty of workmanlike performance claim fails.

### III.   Conclusion

The Court determines that the greater weight of the evidence tends to show that the damage to the Vessel did not occur while Kinder Morgan was performing stevedoring services

in Tampa upon the initial loading of the Vessel. Accordingly, this Court enters its Judgment in favor of Defendant, Kinder Morgan, and decrees that Plaintiff, Meridian Bulk, shall take nothing from this action.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The Clerk is directed to enter **JUDGMENT** in favor of Defendant Kinder Morgan Bulk Terminals, Inc. and against Meridian Bulk Carriers, Ltd.

(2) The Clerk shall terminate all pending motions and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>22nd</u> day of July, 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record